UNITED STATES of America,
Appellee,

v.

Drayton CURRY, Appellant
(two cases).

UNITED STATES of America,
Appellee,

v.

Howard Langston MANLEY, Appellant.

Nos. 74–1097, 74–1098 and 74–1873.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 6, 1974.

Decided April 3, 1975.

Neill H. Fleishman, Fayetteville, N. C., for appellant in Nos. 74–1097 and 74–1873.

Milton E. Moore, Williamston, N. C. (Regina A. Moore, Williamston, N. C., on brief), for appellant in No. 74–1098.

Joseph W. Dean, Asst. U. S. Atty. (Thomas P. McNamara, U. S. Atty., and Christine A. Witcover, Asst. U. S. Atty., on brief), for appellee in Nos. 74–1097, 74–1098, and 74–1873.

Before BOREMAN, Senior Circuit Judge, WIDENER, Circuit Judge, and THOMSEN, Senior District Judge.

BOREMAN, Senior Circuit Judge:

These appeals stem from the convictions of Drayton Curry (No. 74–1097) and Howard Langston Manley (No. 74–1098) for numerous violations of federal drug laws. Since the appellants were tried together and their respective challenges to the judgments of conviction raise several identical legal issues, the appeals of those cases were consolidated. We have joined with those appeals consideration of the appeal by Curry from the district court's denial of his motion for a new trial (in No. 74–1873).

NOS. 74–1097 AND 74–1098

The Government's evidence, if believed, shows that in October 1972 appellant Curry, at the request of one Ellis Sutton who was then in prison, undertook to collect a debt owed by Ben and Joan Brooks to Sutton arising from a sale of heroin. At that time Curry offered to sell additional heroin to the Brookses. On October 29, 1972, the Brookses and others met with the appellants Curry and Manley and observed them distributing heroin. Four eyewitnesses testified to the transactions. One week later, on November 2, 1972, Curry and Manley offered to sell additional heroin to the Brookses—one-eighth of a kilo for $3600. Several hours later the

Brookses, who were joined by one Tammy Myles, called Curry to set up the purchase. Curry agreed to sell the heroin. Manley then met the Brookses and Miss Myles at the place arranged by Curry and sold them the heroin. The Brookses and Miss Myles testified to the transaction. Two and one-half weeks later Myles made an $1800 purchase of heroin from Manley; Curry was not present at this transaction.

Appellant Curry assigns as error the district court's denial of his motion for a continuance. Such a motion is addressed to the sound discretion of the court and denial thereof is not error unless it constitutes an abuse of discretion. United States v. Inman, 483 F.2d 738 (4 Cir. 1973); United States v. Pigford, 461 F.2d 648 (4 Cir. 1972). Curry's counsel argues that he did not have adequate time in which to prepare a defense. The record demonstrates that Curry made no effort to retain trial counsel between August 20, 1973, at which time he retained counsel for purposes of representation at arraignment only, and November 27, 1973, just seven days prior to trial when he employed his present counsel. Had Curry acted with reasonable dispatch in employing counsel for trial, no continuance need have been requested. Where the defendant has unreasonably delayed retention of counsel to represent him and such delay is the sole result of defendant's dilatory tactics it is not an abuse of discretion to deny a request for a continuance based upon an allegation that additional time would be "helpful" in preparing a defense. In any event, defense counsel did have seven days for preparation. We find no merit in this assignment of error.

Curry also charges that the court erred in denying his motion to sever his trial from that of appellant Manley. Specifically, Curry contends there was a misjoinder of defendants in violation of Rule 8(b), Federal Rules of Criminal Procedure. We reject this contention as without merit. The indictment charged and the evidence, if believed, proved that Curry and Manley jointly participated in the series of transactions charged, and they could, therefore, be joined pursuant to Rule 8(b). Although the court could have ordered separate trials pursuant to Rule 14, Fed.R. Crim.P., there was no persuasive reason urged or presented for doing so. Much of the evidence with respect to Manley which Curry argues was prejudicial to him would have been admissible against Curry even if he were tried separately since a conspiracy was alleged.[1]

Both Curry and Manley assign as error the prosecutor's disclosure of Jencks Act material in the presence of the jury. We are in agreement with the views of the Second,[2] Fifth,[3] Seventh,[4] and the District of Columbia[5] Circuits that, *upon the request of counsel,* Jencks Act disclosures should ordinarily be made outside the presence of the jury. We might be somewhat troubled that the prosecutor's actions in this respect were unduly emphasized by the trial court when it read the Jencks Act to the jury. However, careful review of the record reveals that no objection was made to the prosecutor's actions until late in the

1. The Government's evidence tended to show a single continuing conspiracy to make illicit sales of controlled substances and anything said or done by one of the conspirators during the existence of the conspiracy in furtherance of the common design is admissible as to all the conspirators. United States v. Sapperstein, 312 F.2d 694 (4 Cir. 1963). The Government's evidence, if believed, established a single conspiracy involving both appellants of which the alleged transactions were a part; hence, we are not faced with the kind of prejudice we warned against in United States v. Vaught, 485 F.2d 320 (4 Cir. 1973) where one of the offenses charged was not part of a conspiracy involving all the defendants and evidence thereof was inadmissible against those not involved. *See* James v. United States, 416 F.2d 467 (5 Cir. 1969).

2. United States v. Frazier, 479 F.2d 983 (2 Cir. 1973).

3. Beaudine v. United States, 414 F.2d 397 (5 Cir. 1969).

4. United States v. Nielsen, 392 F.2d 849 (7 Cir. 1968).

5. Johnson v. United States, 121 U.S.App.D.C. 19, 347 F.2d 803 (1965).

trial and after this procedure had been followed repeatedly without objection. The trial court read the Act to the jury on that occasion so they might better understand the nature of the dispute between counsel and to preclude any inference by the jurors that evidence was being withheld from them. Additionally, we note that defense counsel made frequent reference to the Jencks Act material while cross-examining witnesses; this procedure made the existence of the material known to the jury and precluded any objectionable inference of the type which the court found sufficient to require reversal in Gregory v. United States, 125 U.S.App.D.C. 140, 369 F.2d 185 (1966).[6] *See* United States v. Gardin, 382 F.2d 601, 605–606 (2 Cir. 1967).[7] In light of all the circumstances we conclude that any error in this respect was harmless.

■■ Both Curry and Manley object to the court's failure to instruct the jury regarding the weight to be accorded the testimony of a witness who has been granted immunity. No timely objection was made to the judge's charge and reversal is warranted only if the error is "plain error." *See* United States v. King, 420 F.2d 946, 947 (4 Cir. 1970). Since all witnesses who were granted immunity were accomplices and since the court instructed the jury that the testimony of an accomplice is "to be received with caution and weighed with great care," the jury were thus instructed to give their testimony special scrutiny. The jurors were informed of those witnesses who had been granted immunity and were given a general instruction on the credibility of witnesses which told them to consider the "interest" of each

witness in the outcome of the case and whether each witness has "any motive or reason for being truthful or untruthful in his testimony." In view of these facts, we conclude that the court's failure to give an instruction specifically relating to the weight to be accorded the testimony of a witness who had been granted immunity was not "plain error" which would command reversal.

■ The court told the jury on two occasions that Willie Curry and Willie Swinson, who were originally co-defendants in this case and whose names appeared in the indictment, had entered pleas of nolo contendere to the charge in the first count, and would not be tried with the others. Appellants concede "an aura of mystery would be present if no explanation at all were given to the absence of co-defendants" but suggest that the jury should not be told that the co-defendants had entered pleas of nolo contendere. While it might be preferable to tell the jury only that the case against the co-defendants had been disposed of previously and that they had been eliminated from the present trial, it was not error, under the circumstances, to reveal to the jury the pleas of the original co-defendants. Wood v. United States, 279 F.2d 359 (8 Cir. 1960). Any prejudice which might have arisen from this information was cured when the court told the jury not to consider those pleas "in any manner as relates to these defendants," and specifically instructed that "it is not to be taken as [evidence of] any guilt of the remaining defendants on trial."

Both Manley and Curry objected to the following question posed by the prosecutor to Sheriff Broughton, a govern-

**6.** In Gregory v. United States, 125 U.S.App. D.C. 140, 369 F.2d 185 (1966), the court held it was error for the trial court to *require* defense counsel to make a Jencks Act motion in the presence of the jury since it might lead the jury to infer that the material represents prior *consistent* statements unless it was used to cross-examine the witness. Since the Jencks Act material in the instant case was used extensively by the defense in cross-examination any unfavorable inference which the jury may have drawn was invited by the defense.

**7.** There may be merit in the procedure for handling Jencks Act material outlined by the Second Circuit in United States v. Gardin, 382 F.2d 601 (2 Cir. 1967). As that case points out, in appropriate circumstances it is entirely proper for the jury to be informed that Jencks Act material has been provided to the defense. That procedure may possibly reduce the likelihood that the jury will draw inferences prejudicial to either side.

ment rebuttal witness, and moved to strike the response:

Q. Do you know what his [Manley's] character and reputation is for dealing in drugs?

A. About a year ago I had information he was dealing in drugs.

The court overruled the objections and denied the motions to strike. For the reasons to be stated we agree that the question was improper and that the court erred in denying Manley's motion to strike the answer.

The question is faulty in that it seeks to inquire about the sheriff's "knowledge" of the "character" of the defendant. "Since the whole inquiry . . . is calculated to ascertain the general talk of people about defendant, rather than the witness' own knowledge of him, the form of inquiry, 'Have you heard?' has general approval, and 'Do you know?' is not allowed." Michelson v. United States, 335 U.S. 469, 482, 69 S.Ct. 213, 221, 93 L.Ed. 168 (1948) (footnote omitted). Additionally, the question is directed to the "character" as well as the "reputation" of the defendant; the permissible inquiry is limited to the reputation of the accused, what those in the community perceive him to be, and not

his character, what he actually is. Torcia, Wharton's Criminal Evidence § 230 (13th ed. 1972).

 The question to the sheriff and the response thereto were clearly improper. There is no indication that the sheriff's information was the consensus of opinion of the defendant's reputation in the relevant community. If the source of that information was a police report or some other nonpublic source it is not admissible to show the defendant's reputation.[8] A witness called by the prosecution to rebut the defendant's evidence of his good reputation can only testify as to the consensus of opinion about the defendant which he has heard circulating in the relevant community concerning the defendant.[9]

Whether by inadvertence or design, the Government's examination of Sheriff Broughton allowed him to make a personal and vindictive attack upon the "character" of the accused. Although the court did exclude part of the Sheriff's intemperate remarks,[10] his testimony was more inflammatory than informative.

 We are also troubled by the narrow scope of the prosecutor's ques-

---

**8.** In Eley v. United States, 117 F.2d 526 (6 Cir. 1941), the prosecution attempted to rebut the defendant's evidence of his good reputation by showing other unrelated convictions and other specific acts which tended to denote bad character and would normally create a bad reputation. In reversing the conviction because of the admission of such rebuttal testimony, the appellate court stated, at page 529:

"We are unable to follow the reasoning of the court which led it to admit the challenged evidence not to establish specific acts but for the limited purpose of showing the general reputation of the defendant. There was no proof that the prior convictions and the subsequent unlawful acts of the appellant were known to the community, or that they in any wise impaired the reputation of the appellant as a man of honesty and integrity. . . ."

**9.** It is desirable in this connection to note the difference between one's reputation and a rumor about the person. Professor Wigmore has suggested two distinctions between reputation and rumor which may account for ad-

mission of the former but not of the latter on direct examination. "On the one hand, reputation implies the definite and final formulation of opinion by the community; while rumor implies merely a report that is not yet finally credited. On the other hand, a rumor is usually thought of as signifying a particular act or occurrence, while a reputation is predicated upon a general trait of character. . . ." 5 J. Wigmore, Evidence § 1611 (3rd ed. 1940). The sheriff's answer in the instant case appears to refer to a rumor rather than to the defendant's reputation.

**10.** When the prosecutor asked Sheriff Broughton about Manley's general character and reputation, the Sheriff responded, "I would say bad, he would do anything to make a fast dollar." Manley's objection and the motion to strike were overruled and the Sheriff repeated his answer in a more distinct fashion. The next day the court ordered that the comment be stricken and told the jury to disregard it. In view of our ultimate disposition we need not decide whether this belated curative instruction was sufficient.

tion. Where the prosecution seeks through its own rebuttal witnesses to challenge the defendant's evidence of his own good *general* reputation it is limited to showing his bad general reputation.[11] Of course, the prosecutor is free upon cross-examination to inquire of the defendant's reputation witnesses whether they have heard particular rumors about the defendant or have heard about specific instances of misconduct on his part [12] but such inquiries are for the purpose of revealing inconsistencies between what the witness has heard and the conclusion about the defendant's reputation which the witness expressed upon direct examination, and not for the purpose of proving the defendant's bad reputation.[13] While narrow questions about specific traits of the accused are proper rebuttal in some circumstances,[14] the prosecution is not permitted to elicit testimony from its own rebuttal witnesses concerning *specific traits* of the defendant for the sole purpose of repudiating the defendant's evidence of his *general reputation.*[15] Evidence of a specific trait is not sufficiently relevant to the defendant's general reputation to outweigh the likelihood that such evidence will prejudice the defendant by characterizing him as the type of person who is likely to commit the particular crime charged.

■ We conclude that the court erred in overruling Manley's objection to the prosecutor's question and in denying his motion to strike the answer. The probability that this improper evidence unduly influenced the jury and denied Manley a fair trial is so great that we cannot treat the error as harmless. We think that the conviction of Manley must be set aside and that he is entitled to a new trial.

■ Although this evidence was so prejudicial to Manley that he is entitled to a new trial we do not believe that it resulted in prejudice to Curry. The jurors were instructed that, "Each defendant is entitled to have his case determined from his own acts and statements, and the other evidence in the case which may be applicable to him," and were warned that "the fact that you may find one defendant guilty should not control your verdict as to the other defendant."

■ However, we find merit in Curry's contention that his sentence is improper because it imposes consecutive sentences for two offenses which, under the facts of this case, merge into a single offense. In United States v. Atkinson, et al., 512 F.2d 1235 (1975), decided by this court subsequent to the trial of this case and its presentation on appeal, we held that where there is no evidence of possession with intent to distribute a controlled substance apart from evidence of the actual transfer of the substance pur-

---

**11.** The following quotation from United States v. Lewis, 157 U.S.App.D.C. 43, 482 F.2d 632 (1973), addresses this point:

"The accused may elect to advance one or more of his character traits as evidence of his innocence. If he does, his proof is confined to evidence of his reputation in the community for those traits. His presentation, in terms of number of such traits, may be as narrow or as broad as he chooses so long as it remains germane to issues on trial.

. . . .

"The Government's options as to character-proof depend upon what the accused undertakes to do. . . . The prosecutor cannot offer bad-character evidence unless the accused first introduces evidence of good character; even then, the prosecutor's proof is restricted to community reputation, and to the trait or traits to which the accused's own character evidence related." *Id.* 482 F.2d at 637–638 (footnotes omitted).

**12.** Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948).

**13.** Shimon v. United States, 122 U.S.App.D.C. 152, 352 F.2d 449, 453–454 (1965); Mannix v. United States, 140 F.2d 250, 252 (4 Cir. 1944).

**14.** Where evidence of a particular trait is offered for some purpose other than to rebut the defendant's evidence of his good general reputation it may be admissible. *See* Aaron v. United States, 397 F.2d 584 (5 Cir. 1968) (Government's evidence of defendant's bad reputation limited to specific traits put in issue by the defendant); United States v. Fink, 502 F.2d 1, 5–6 (5 Cir. 1974) (Evidence of defendant's reputation as a drug smuggler admitted to show predisposition to commit the crime and thereby rebut entrapment defense).

**15.** *Cf.* United States v. Harrell, 436 F.2d 606 (5 Cir. 1970); Salgado v. United States, 278 F.2d 830 (1 Cir. 1960).

suant to a sale, the offenses of possession with intent to distribute, 21 U.S.C. § 841(a)(1), and distribution, 21 U.S.C. § 841(a)(1), merge into a single offense. In the instant case the evidence of the sale was relied upon to prove Curry's "intent to distribute" at the time of his possession. The gravamen of each offense is the distribution of a controlled substance: when the intent is carried out by a successful sale the offenses merge. To paraphrase the language of the Supreme Court on a similar point, we hold, therefore, that when Congress made either distribution or possession with intent to distribute a crime it intended that the maximum punishment for distribution should remain at fifteen years but, even if the culprit should fall short of accomplishing his purpose, he could be imprisoned for fifteen years for possessing with the felonious intent. *See* Prince v. United States, 352 U.S. 322, 329, 77 S.Ct. 403, 1 L.Ed.2d 370 (1957). In light of our conclusion concerning the consecutive sentences imposed on Curry this case will be remanded to the district court for the purpose of resentencing.

■ No useful purpose would be served by discussion of the other alleged errors cited by appellants. We have carefully examined them and are not persuaded that they require reversal. Nor are we persuaded by Curry's contention that the cumulative effect of those alleged errors plus the other alleged errors discussed previously requires a reversal of his conviction. It has been said that there is no such thing as a perfect trial. It is seldom possible to conduct a trial free of error; innocent mistakes of a technical and inconsequential nature occur in the most carefully planned and skillfully conducted trials. The law does not require that a trial be free of error; it only requires that the trial be fair and free of prejudice to the defendant. Our review of the proceedings below convinces us that any error therein was harmless with respect to appellant Curry and that his conviction, subject to resentencing, must be affirmed.

## NO. 74–1873

Curry prosecutes a separate appeal from the district court's denial of his motion for a new trial. Curry asserts that subsequent to his trial he learned of the existence of several tape recordings of government agents' conversations with Ellis Sutton who was a government witness in the instant case. Apparently those conversations were had primarily with respect to another case and another trial and, although the Assistant United States Attorney who tried the instant case was present at some of those conversations and knew of the existence of three of the tapes, he was unaware of the tapes of the other conversations. The Assistant United States Attorney states that the three tapes of conversations which he knew existed were not presented pursuant to Curry's Jencks Act motion because (1) the tapes were never transcribed, (2) the tapes did not form the basis for any indictment or information, (3) all information in those conversations at which the Assistant United States Attorney was present which he believed relevant to appellant Curry was furnished to Curry's counsel in the form of handwritten notes, and (4) most of the contents of those tapes were unrelated to Sutton's testimony at trial.

■ The district court made an *in camera* examination of all nine tapes and concluded that one short segment of one of the tapes contained incidental references to Curry. That particular tape was one of the three tapes known to exist by the Assistant United States Attorney who, as the district court noted, "upon feeling they were not relevant erroneously made the decision not to mention them." In an unreported opinion the district court made a thorough examination of the case law and concluded that since the information revealed by the relevant portion of that tape was identical to information which had previously been supplied to the defense by way of the transcript of Sutton's grand jury testimony, any error in failing to reveal the contents of that tape to the

defense was harmless. This court has made an independent review of that particular tape and concludes that the district court was correct in its determination that the error was harmless. We believe that the vigorous cross-examination of Sutton by defense counsel, the availability of Sutton's grand jury testimony, and the fact that Sutton's testimony at trial did not directly implicate Curry places this case within that narrow group of cases where an unintentional violation of the Jencks Act should be excused. *See* United States v. Missler, 414 F.2d 1293 (4 Cir. 1969).

For the foregoing reasons, we affirm Curry's conviction and remand for resentencing in No. 74–1097; we reverse Manley's conviction and remand for a new trial in No. 74–1098; we affirm the district court's denial of Curry's motion for a new trial in No. 74–1873.